**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ALEXANDER STROSS** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION # 1:13-CV-419** |
| | : | |
| vs. | : | |
| | : | |
| **ZIP REALTY, INC.** | : | **JURY DEMANDED** |
| | : | |
| **Defendant** | : | |
| | : | |
| | : | |

### PLAINTIFF'S ORIGINAL COMPLAINT

PLAINTIFF, Alexander Stross, by and through his undersigned attorneys, respectfully alleges as follows for his complaint against Defendant, ZipRealty, Inc.:

### PARTIES

1.     Plaintiff Alexander Stross ("Plaintiff" or "Stross") is an individual residing in Austin, Texas.

2.     Defendant ZipRealty, Inc. ("Defendant" or "ZipRealty") is a Delaware corporation headquartered in Emeryville, California, with a Texas office at 1445 North Loop West, Suite 350, Houston, TX 77008, and a local address listed at 701 Brazos Street, Suite 1050, Austin, Texas, 78701.  According to records filed with the Texas Secretary of State, Defendant may be served with process through its registered agent, National Corporate Research, LTD, at 800 Brazos St., Suite 400, Austin, Texas 78701.

### NATURE OF THE CLAIMS

3.     This is an action for copyright infringement and violations of the Digital Millennium Copyright Act ("DMCA"), arising in connection with the unauthorized commercial

exploitation of over 1,300 of Plaintiff's architectural photographs on Defendant ZipRealty's website.

## JURISDICTION AND VENUE

4.     This action arises under 17 U.S.C. §§101 *et seq.* (the U.S. Copyright Act).  The Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 (federal question) and 1338(a) (copyrights).

5.     This Court has personal jurisdiction over Defendant because, among other things, Defendant has several offices in Texas, Defendant has done and is doing business in Texas under a license issued by the Texas Real Estate Commission, and because Defendant has committed, and continues to commit, infringing and other illegal acts inside and outside the state of Texas which have had, and are having, an effect within the state of Texas.

6.     Venue is proper in this District under 28 U.S.C. §§1391(b), (c) & (d), and 28 U.S.C. § 1400(a).

## CONDITIONS PRECEDENT

7.     All conditions precedent have been performed or have occurred.

## BACKGROUND FACTS

**A.     THE PARTIES**

8.     Plaintiff Alexander Stross is a highly regarded architectural photographer who has worked with some of the most respected names in Central Texas real estate, including Dick Clark Architecture, Wilson Goldrick Realtors and Gottesman Residential.  Licensed uses of his works have appeared in magazines, billboards, online advertising, and the like.  In addition, Stross regularly licenses his works to real estate agents/brokers for use in marketing their active real estate listings in so-called "multiple listing services" ("MLS") such as the Austin/Central

Texas MLS.  Stross is also a builder and licensed real estate broker, and often photographs his own real estate listings for use in the Austin/Central Texas MLS.

9.      Defendant ZipRealty is a nationwide residential real estate brokerage company with 19 U.S. offices, and affiliate relationships with another 15 third-party brokerage companies.[1]  Defendant's business model relies heavily on internet marketing - particularly through its website ZipRealty.com, which it claims is "the number one most visited brokerage website in the U.S."[2]  A central feature of Defendant's website is its search engine, which compiles information from MLS listings across the country.  Defendant uses this search engine to attract prospective home buyers - referred to as "leads" - which are cultivated by Defendant's local agents, and its network of affiliated third party brokers.[3]  Defendant further monetizes its website (and the content thereon) by selling advertising in the form of banner ads, etc.[4]

**B.      THE AUSTIN/CENTRAL TEXAS MLS & IDX**

10.      Defendant is not the only real estate brokerage company using the internet to promote its services.  Virtually every major residential real estate brokerage has its own website where home buyers can shop for active listings.  Usually this is accomplished by way of an embedded search engine which retrieves data from a local MLS - owned and operated by the local board of realtors, and made available through one or more data feed systems.

11.      For Austin and the surrounding area, the MLS is owned and operated by the Austin Board of Realtors ("ABOR") through its wholly-owned subsidiary Austin/Central Texas

---

[1]      http://www.ziprealty.com/blog/many-us-cities-becoming-sellers%E2%80%99-real-estate-markets-according-ziprealty.

[2]  http://ir.ziprealty.com/phoenix.zhtml?c=180169&p=irol-newsArticle&ID=1731724&highlight=.

[3]  *See* http://lowes.inman.com/InmanINF/lowes/news/162383.

[4]  http://www.ziprealty.com/advertise/index.jsp.

Realty Information Service ("ACTRIS").  In addition to operating the Austin/Central Texas MLS, ACTRIS promulgates the rules and regulations for its use (the "ACTRIS Rules").  Each ABOR member who wishes to gain access to the Austin/Central Texas MLS, must, among other things, submit an Applicant Agreement to ACTRIS.[5]  The ACTRIS Rules are incorporated into the Applicant Agreement, forming a "binding legal agreement between ACTRIS and [the Member]."[6]  Qualified members who have gone through this application process and thereby gained access to the Austin/Central Texas MLS and IDX are referred to in the ACTRIS Rules as "Participants."

12.    Like most MLS's, ACTRIS provides much of its data through a so-called "Internet Data Exchange" ("IDX").  The ACTRIS IDX feed provides MLS data to brokers wishing to advertise other broker's listings.  The ACTRIS IDX operates under a system of "reciprocity," whereby a Participant can opt to allow other Participants to display his/her *active* property listings on their websites in exchange for the corresponding right to display those Participants' active listings on his own website. ACTRIS Rules, §§ 8.1-8.2.  "Statuses deemed to be active listings are active, active contingent, and pending backup." *Id.*  Thus, by opting-in to the IDX, Participants grant other Participants the limited right to display their listings and related content (including photographs), so long as the listings are "active," "active contingent," or "pending back-up."  Conversely, Participants are prohibited from displaying "inactive listings" (*i.e.*, listings identified as "expired," "withdrawn," "terminated," "sold" and/or "pending"). *Id.*, §§ 8.1, 8.2, 8.15.

---

[5] *See* ACTRIS Rules, August 2012, p. 3, Definition O: "Participants."

[6] *Id.*, p.1, Introduction.

13.     ACTRIS also provides MLS data feeds to so-called Virtual Office Websites ("VOWs"), which ACTRIS defines as "a Participant's Internet website, or a feature of Participant's website, through which the Participant is capable of providing real estate brokerage services to consumers . . . " ACTRIS Rules, § 9.1  Like the rules applicable to IDX, ACTRIS's VOW rules specifically prohibit the display of "expired," "withdrawn," or "pending" listings. *Id.*, § 9.21.  However, unlike IDX, ACTRIS *does* allow VOWs to make *limited* use of "sold data" to "support an estimate of value on a particular property for a particular client." ACTRIS Rules §§ 7.3, 9.21.  Notwithstanding, "sold data may not be provided to the consumer if the sold data is chosen by the consumer." *Id.*, §§ 7.3.  Thus, VOWs are prohibited from allowing their clients to proactively search for "sold" listings, or to display content associated therewith (including photographs). *Id.*

**C.   DEFENDANT'S UNAUTHORIZED USE OF STROSS' PHOTOGRAPHS, AND VIOLATION OF THE ACTRIS RULES**

14.     As a Participant, Defendant had (and has) direct access to the Austin/Central Texas MLS, and the photographs contained therein.[7]  Among the real estate listings available to Defendant through the Austin/Central Texas MLS were (and are) Stross' active listings, and the active listings of other Participants to whom Stross has granted limited licenses for the use of his photographs.  Had Defendant restricted its use of Stross' photographs to the display of those "active" listings (as required by the ACTRIS Rules), there might be no issue.  But it did not. Instead, as set forth below, Defendant has operated (and continues to operate) a real estate search engine that exploits content to which it has no rights.

---

[7] *See* http://www.ziprealty.com/homes-for-sale/austin/Austin-TX (disclaimer at the bottom of the page) identifying Zip as a "Participant" of ACTRIS.  In fact, Zip recently bragged that its "direct access" to MLS data is one of its key competitive advantages, distinguishing Zip's website from other real estate websites like *Trulia* and *Zillow*. *See*, http://www.ziprealty.com/blog/test-freshness-our-new-tool-listing-check  ("you're seeing more homes on ZipRealty.com and seeing them faster than you do on other real estate websites! . . . ZipRealty has a relationship with your local MLS . . . we get our listings of homes for sale straight from the source.").

15.     In or around mid-2012, Stross discovered several of his "inactive" listings on the IDX portion of Defendant's website.  There was no ambiguity about the fact that the listings were "inactive" since Defendant's website specifically identified them as "Off Market," or in some instances "Recently Sold."  Some of the listings had been off the market for more than a year, and yet continued to be displayed with all original photographs - in direct violation of the ACTRIS Rules.  Shortly after Plaintiff's discovery, Defendant appeared to move these inactive listings to the VOW portion of its website; however, as set forth below, it continued to violate ACTRIS rules pertaining to the display of such content.

16.     To date, some 88 inactive listings,[8] along with 1,324 of Stross' registered, copyrighted photographs ("Works"), have been identified on ZipRealty.com. *See* **Exhibit "A."** Because these inactive listings do not appear on the website by way of "hyperlink"[9] or other "in-line linking,"[10] it would appear that Defendant not only displays the listings (and related content), but also copies the listings and content to its servers (or servers which are under its control), and maintains those copies well after the listings are inactive (an activity sometimes referred to as "scraping").  This, too, is a violation of ACTRIS Rules. *See* ACTRIS Rules, § 9.10.

17.     Stross has never directly authorized Defendant to copy, display or otherwise exploit his Works - much less the Works associated with his inactive listings.  Nor does Defendant have any authority under the ACTRIS Rules to copy, display or otherwise exploit these Works - either through IDX, or as a VOW (since they come from "inactive" listings). *See* ACTRIS Rules, §§ 7.3, 8.1, 8.2, 8.15, 9.21.  As a result, Defendant has engaged in the

---

[8] Of these, 63 listings were "sold," 14 were "expired," 10 were "withdrawn and 1 was "pending."

[9] A "hyperlink" is a graphic or piece of text that links to another website.

[10] *Wikipedia* refers to "in-line linking" as: "the use of a linked object, often an image, from one site by a web page belonging to a second site.  The second site is said to have an inline link to the site where the object is located."

unauthorized commercial use of some 1,324 of Stross' Works, in violation of the U.S. Copyright Act.

18.     Upon information and belief, Defendant's distribution and display of photographs from inactive MLS listings is part of a deliberate effort to increase web traffic, lure prospective home buyers, and monetize intellectual property that does not belong to it.  For instance, Defendant's "scraping," retention and display of this content almost certainly increases its search engine rank position (for both its homepage and its inner-pages) on third party search engines such as Google, thereby driving more buyers to its website.  Moreover, Defendant specifically incorporates inactive listings as a means of distinguishing its search engine from competitor search engines like *Zillow* and *Trulia*, which Defendant criticizes for having "incomplete" data.[11] In contrast to those sites, Defendant's search engine features a "tool" called "Listing Check," which allows users to specifically retrieve and display inactive listings - including all original photographs associated therewith.[12]  Visitors to Defendant's website can use this information to conduct independent research; or in some instances, to actually pursue a contract on the inactive listing through one of Defendant's agents or affiliate agents.[13]  Defendant pays absolutely nothing for this robust visual content, even though it knows (or should know) that it has no

---

[11] *See* http://www.ziprealty.com/blog/ziprealty%E2%80%99s-new-listing-check-tool-allows-consumers-verify-if-homes-they-find-online-are-really-sale.

[12] The Listing Check tool is available at http://www.ziprealty.com/listing-check?src=hp.

[13] In the "Frequently Asked Questions" portion of Zip's website (http://www.ziprealty.com/faq/), it explains the scenario as follows:

"What does it mean when a listing is 'inactive?'
A listing is changed to the status of inactive on the ZipRealty.com site when it is no longer "For Sale" in the MLS. Some properties that are pending sale might accept backup offers, and some sales are not completed, so the property goes back on the market. So if you are interested in or have a question about an inactive property, contact your agent.

7

authority to use it.  Through its affiliate program, Defendant further monetizes this content by making it available to third party brokers and their prospective customers.

**D.     DEFENDANT'S     TAMPERING     WITH     COPYRIGHT     MANAGEMENT INFORMATION**

19.     Stross' MLS listings contain important identifying information, including his name, contact information, and other attributions intended to designate him as the source of the listings and the copyrighted photographs accompanying same (collectively, "Copyright Management Information," or "CMI").     ACTRIS acknowledges the importance of this information by specifically requiring Participants to incorporate it when displaying another Participant's content. *See* ACTRIS Rules, §§ 8.11(c), 9.23

20.     In addition to copying and/or displaying Stross' Works without authorization, until late-2012, Defendant routinely re-published these works *without* the accompanying CMI. Worse, Defendant falsely stated in captions next to each photo that the Works were "sourced" from "public records" (or, in some cases, included no attribution at all) - thereby suggesting that the Works were not protected by federal copyright, and falsely suggesting that the Works could be used by *anyone* on a gratis basis.  By all appearances, Defendant manipulated CMI in this manner in an effort to conceal the fact that it was exploiting federally copyrighted material without the authorization of the copyright owner.

21.     Stross now brings this suit for copyright infringement.

**COUNT I:**
**COPYRIGHT INFRINGEMENT**

22.     Stross realleges and incorporates herein the foregoing paragraphs.

23.     By its actions alleged above, Defendant has infringed Plaintiff's copyrights in the Works (a total of 1,324 photographs).     Specifically, by aggregating, copying, displaying,

8

distributing and otherwise exploiting Stross' Works on its website, Defendant has infringed Plaintiff's exclusive rights set forth in 17 U.S.C. §106. Defendant's actions constituted willful infringement of Stross' copyrights inasmuch as it knew, or had reason to know, that its use of Stross' Works was unauthorized; and/or because it acted with reckless disregard of Stross' copyrights.

24.     As a result of the foregoing, Stross is entitled to actual damages, plus Defendant's profits; and/or statutory damages of up to $150,000 per work infringed, plus attorney's fees and costs of court.

## COUNT II
## COPYRIGHT INFRINGEMENT – REMOVAL OF COPYRIGHT MANAGEMENT SYSTEMS

25.     Stross realleges and incorporates herein the foregoing paragraphs.

26.     By its actions alleged above, Defendant has violated Section 1202 of the Digital Millennium Copyright Act by providing false CMI related to Stross' Works and/or by removing or altering Stross' CMI (hereinafter, collectively referred to as "Tampering"). Defendant Tampered with Stross' CMI knowingly, and with the intent to induce, enable, facilitate and/or conceal infringement. In the alternative, Defendant Tampered with Stross' CMI without his authorization - knowing, or with respect to civil remedies under 17 U.S.C. 1203 having reasonable grounds to know, that its actions would induce, enable, facilitate, or conceal infringement of Stross' copyrights.

27.     As a result of the foregoing, Stross is entitled to actual damages plus the profits of Defendant, or in the alternative, statutory damages for each violation[14] in an amount no less than $2,500 and no more than $25,000; plus attorney's fees. 17 U.S.C. §1203(b)(5) & (c).

---

[14] *See See Interplan Architects, Inc. v. C.L. Thomas, Inc., 4:08-CV-03181, 2010 WL 4366990 (S.D. Tex. Oct. 27, 2010)* citing *Goldman v. Healthcare Management Sys., Inc.,* 559 F. Supp. 2d 853, 868 (W.D.Mich. 2008) (each "distribution" of an infringed work constitutes a distinct "violation").

## J**URY** D**EMAND**

28.     Stross asserts his rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## P**RAYER**

For the foregoing reasons, Stross requests judgment against Defendant for the following:

A.      An order that Defendant and all persons under its direction, control, permission or authority be enjoined and permanently restrained from exploiting the Works;

B.      For each Work infringed, an award of actual damages and/or statutory damages under 17 U.S.C. § 504(c);

C.      For each violation of the Digital Millennium Copyright Act, an award of statutory damages under 17 U.S.C. §1203(c);

D.      An award to Plaintiff of his reasonable costs and attorney's fees under 17 U.S.C. §§ 505 and 1203(b)(5);

E.      Prejudgment and post-judgment interest on any damage award as permitted by law; and

//

//

//

//

//

//

//

F.      Such other and further relief as the Court may deem just, proper and/or necessary

under the circumstances.

Dated this 22nd Day of May, 2013

**LAW OFFICE OF BUCK MCKINNEY, PC**


/s/ R. Buck McKinney
R. Buck McKinney
State Bar No. 00784572
2203 E. 5th St.
Austin, Texas 78702
Telephone:  512/236-0150
Fax:  512/444-1879
Email: *mckinney@buckmckinney.com*
ATTORNEY FOR PLAINTIFF ALEXANDER STROSS


**Of Counsel:**


/s/ Brooks V. Rice
Brooks V. Rice
BROOKS RICE LAW
State Bar No. 24076645
401 Congress Ave., Ste. 1540
Austin, Texas 78701
Phone: 512/323-2163
Fax:
Email: *brooks@brooksricelaw.com*
ATTORNEY FOR PLAINTIFF ALEXANDER STROSS